## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **LEROY D. HATFIELD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:07-00267** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the Court on the Plaintiff's Motion for Summary Judgment (Document No. 14.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 19.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 7 and 8.)

The Plaintiff, Leroy D. Hatfield (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on March 6, 2003 (protective filing date), alleging disability as of January 26, 2002, due to gouty arthritis, degenerative disc disease, and hepatitis C.[1] (Tr. at 63, 64-66, 68, 75, 367A-C.) The claim was denied initially and upon reconsideration. (Tr. at 29-31, 36-38, 367F-H, 367L-N.) On March 19, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr.

---

[1] In his request for reconsideration, Claimant alleged the additional disabling impairments of depression and high blood pressure. (Tr. at 36, 96.)

at 39.) The hearing was held on February 27, 2006, before the Honorable Steven A. De Monbreum.[2]
(Tr. at 386-413.) By decision dated April 27, 2006, the ALJ determined that Claimant was not
entitled to benefits. (Tr. at 15-26.) The ALJ's decision became the final decision of the
Commissioner on March 15, 2007, when the Appeals Council denied Claimant's request for review.
(Tr. at 7-10.) On May 1, 2007, Claimant brought the present action seeking judicial review of the
administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.
See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the
"inability to engage in any substantial gainful activity by reason of any medically determinable
impairment which can be expected to last for a continuous period of not less than 12 months . . . ."
42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of
disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled"
at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under
the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§
404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from
a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third
inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to
Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the
claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the

---

[2] The parties initially convened for an administrative hearing on September 21, 2005, but the
ALJ ordered psychological testing for Claimant and continued the hearing. (Tr. at 414-20.)

claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a).[3] First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

---

[3] As noted above, these Regulations were substantially revised effective September 20, 2000. *See* 65 Federal Register 50746, 50774 (August 21, 2000).

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a

4

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 25, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative disc disease, hepatitis C, gout, and a history of polysubstance dependence/abuse, which were severe impairments. (Tr. at 25, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 25, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, with an avoidance of cold or vibrations, and limitations of no more than

---

continued need for such an arrangement.

5

occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. at 25, Finding No. 7.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 25, Finding No. 8.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a parking lot attendant, domestic cleaner, and kitchen worker, at the light level of exertion. (Tr. at 25-26, Finding No. 13.) On this basis, benefits were denied. (Tr. at 26, Finding No. 14.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on January 30, 1954, and was 52 years old at the time of the

administrative hearing, February 27, 2006. (Tr. at 16, 23, 64, 367A.) Claimant had a ninth grade, or limited education. (Tr. at 16, 23, 72, 393.) In the past, he worked as a coal truck driver and a garbage truck driver. (Tr. at 16, 69-70, 78-84, 390-93, 404-05.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider Claimant's psychiatric and psychological impairments. (Document No. 15 at 5-7.) Specifically, Claimant contends that the ALJ erred in accepting "the speculation of Crystal Whittington that the [Claimant] did not suffer from mental retardation. This opinion in turn was based on Ms. Whittington's speculation that the claimant did not suffer from developmental or organic problems prior to reaching age 22." (Id. at 6.) Claimant asserts that nothing in the record contradicts his reduced IQ scores and learning abilities. (Id.) Claimant further asserts:

> In essence, both Ms. Whittington and the ALJ speculated that because the claimant had been able to perform some employment during his life, his current impairments could somehow have no effect on him. Claimant submits that, at a minimum, this claim should be remanded to allow an ALJ to actually evaluate all aspects of the claimant's impairments including his psychological and psychiatric impairments.

(Id.)

The Commissioner asserts that the ALJ properly considered Claimant's psychiatric and psychological impairments and that his decision is supported by the examination findings and opinions of Psychologist Whittington and the opinion of the state agency psychologist, Rosemary

7

L. Smith, Psy.D. (Document No. 19 at 18-19.) The Commissioner points out that Psychologist Whittington "indicated no limitations in any of the numerous listed areas, [and therefore,] the ALJ reasonably determined that Plaintiff's mental limitations did not impact his ability to perform unskilled work. (Id. at 18.) In any event, the Commissioner asserts that the ALJ determined that the jobs identified by the VE involved only short, simple, easy-to-learn, unskilled job tasks that required only level one reading, math, reasoning ability, and minimal interaction with the public. (Id.) Psychologist Smith opined that Claimant did not have a severe mental impairment, and opined that his May, 2003, IQ scores were entitled to no weight because Claimant had a CDL license, was a truck driver, and was in the service, and that he gave up easily on difficult tasks. (Id. at 19.) Ms. Smith opined that Claimant had only mild limitations in activities of daily living, social functioning, concentration, persistence, and pace, with no episodes of decompensation. (Id.) Thus, the Commissioner asserts that the ALJ's decision is supported by substantial evidence. (Id.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in presenting hypothetical questions to the VE. (Document No. 15 at 7.) In particular, Claimant contends that the ALJ failed to include in the hypothetical questions limitations regarding Claimant's psychological and psychiatric impairment and his learning disability. (Id.) The Commissioner asserts that the ALJ "extensively questioned the VE regarding the mental demands of the jobs identified," and therefore, Claimant's argument is without merit and that substantial evidence supports the ALJ's reliance on the VE's testimony. (Document No. 19 at 17.)

1. Mental Impairments.

Claimant first alleges that the ALJ erred in accepting the speculation of Psychologist Crystal

8

Whittington that Claimant did not suffer from mental retardation. (Document No. 15 at 6.) The Commissioner asserts that substantial evidence supports the ALJ's decision that Claimant retained the mental capacity to perform the work identified by the vocational expert despite Claimant's depressive disorder and learning disorders of math and written expression. (Document No. 19 at 17-19.)

"The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2006); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2006). The required level of severity for Listing 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. U.S. Dept. of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam).  A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c) (2006). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C.  Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities.  The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also, The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999) (defining mental retardation as "significantly subaverage intellectual quotient with related limitations in two or more of the following: communication, self-

care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.").[5] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, ("DSM-IV")(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well he meets the standards of personal independence expected of someone in his particular age group, sociocultural background, and community setting. Id. at 40. Thus, the Regulations make clear that Listing 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

The record in this case disclosed that on May 8, 2003, Claimant underwent a psychological evaluation by Angela Cook Waggoner, M.A., Supervised Psychologist, and Mari Sullivan Walker, M.A., L.P.C., Licensed Psychologist. (Tr. at 17-18, 170-77.) At that time, Claimant reported that he drove himself to the evaluation and lived with his ex-wife out of financial necessity. (Tr. at 17, 170-

---

[5] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning. Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

71.) Claimant reported that his depressive and anxiety symptoms began after he lost his job in 2000, at which time he began to experience significant medical problems. (Tr. at 17, 171.) He stated that he was unable to take care of himself, that his nerves were "destroyed," and that he experienced significant symptoms of depression and anxiety, which included sleep and appetite disturbances, anhedonia, irritability, feelings of hopelessness, frequent mood swings, crying spells, feelings of losing control, and disturbances in performing activities of daily living. (Tr. at 17, 171.) Claimant indicated that he did not have medical coverage and was unable to pay for medical visits or prescribed medications. (Tr. at 17, 171.)

Claimant reported that he attended school through the ninth grade at which time he quit due to difficulty reading and writing. (Tr. at 17-18, 172.) He stated that he attended special education classes, had marked difficulty understanding and completing assignments, exhibited significant acting out and behavioral problems throughout his school years, and that he frequently was suspended for having been disrespectful to authority figures, fighting, and engaging in other oppositional behavior. (Id.) Claimant also reported that at the age of nineteen, he enlisted in the United States Army for three years, but remained in the service for only one year. (Tr. at 18, 172.) He stated that he went AWOL on three separate occasions during the first year in the military. (Id.) After having been AWOL for six months, Claimant turned himself in and shortly thereafter was dishonorably discharged. (Id.)

On mental status exam, the psychologists noted that Claimant tired easily and seemed overwhelmed by difficult tasks, did not initiate conversation and spoke only when asked a direct question, and that he exhibited normal speech tone, which was clear and concise. (Tr. at 17-18, 173.) Claimant presented with a depressed mood and blunted affect, normal stream of thought, an absence

of delusions and obsessive or compulsive behaviors, poor insight, severe deficient judgment, normal immediate memory, severely deficient recent memory, and moderately deficient remote memory. (Id.) The psychologists noted that Claimant's concentration was mildly deficient and that his psychomotor behavior was moderately retarded. (Id.)

Psychological testing revealed a verbal IQ of 73, performance IQ of 70, and a full scale IQ of 69. (Tr. at 18, 173.) Scores on the WRAT-3 indicated that Claimant read at the eighth grade level, spelled at the fourth grade level, and performed arithmetic at the third grade level. (Tr. at 18, 174.) The psychologists opined that Claimant's IQ and WRAT-3 scores reflected a good indication of his abilities in those areas. (Tr. at 18, 173-75.) Claimant was diagnosed with major depressive disorder, single episode, severe, without psychotic symptoms; generalized anxiety disorder; polysubstance dependence; mild mental retardation; and personality disorder, not otherwise specified. (Tr. at 18, 175.) The psychologists noted that during the evaluation, Claimant had difficulty concentrating and paying attention, tired easily and gave up easily on difficult tasks, understood the questions and often asked for repetition of the directions, did not initiate conversation, fidgeted in his chair, and appeared somewhat restless. (Tr. at 17-18, 176.) Accordingly, the psychologists opined that Claimant's concentration was mildly deficient, his social functioning and persistence were moderately deficient, his pace was moderately slow, and his prognosis was guarded. (Tr. at 17-18, 173, 176.) In conclusion, the psychologists opined that Claimant was "incapable of sustaining steady gainful employment at this time due to the combination of his psychological and physical conditions. Once these conditions are addressed and stabilized, [Claimant] may be a future candidate for rehabilitative services." (Tr. at 18, 176.)

On November 14, 2003, Sunny S. Bell, M.A., a licensed psychologist, performed a further

mental status examination of Claimant. (Tr. at 18, 230-34.) Claimant reported that he drove two hours for the examination. (Tr. at 18, 230.) He stated that he had been depressed for a long time, and that his best friend shot himself in front of him in February, 2003. (Tr. at 18, 231.) Claimant reported crying spells, vague suicidal thoughts but no plan, that he was apathetic and withdrawn, feelings of hopelessness and helplessness, claustrophobia, and sleep difficulties. (Id.) Contrary to his statements to Ms. Waggoner and Ms. Walker that he attended special education classes, Claimant report to Ms. Bell that he was a regular education student, but made below average grades, and was never retained. (Tr. at 18, 231.) Also, contrary to his prior statements, Claimant told Ms. Bell that he was not a discipline problem in school. (Id.) He stated that he could read and write "pretty good," though he obtained his driver's license via the oral test on his seventh attempt, having failed the written test six times. (Tr. at 18, 231-32.)

On mental status exam, Ms. Bell observed, contrary to Ms. Waggoner and Ms. Walker, that Claimant was cooperative, motivated, interacted in a socially appropriate manner, and spontaneously generated conversation. (Tr. at 18, 232.) Claimant exhibited good eye contact, a sense of humor, and clear, goal-directed, and relevant speech. (Id.) Claimant's mood was depressed, his affect was restricted, his thought processes appeared goal directed, his insight was limited, and his judgment was markedly deficient. (Id.) Claimant admitted to vague suicidal and homicidal thoughts but no attempt or plan. (Tr. at 18, 233.) Ms. Bell noted that his immediate and remote memory skills were normal, that his recent memory skills were moderately deficient, his concentration was mildly deficient, and that he exhibited no gross psychomotor difficulties. (Id.) Ms. Bell diagnosed depressive disorder, not otherwise specified. (Id.) Claimant reported his daily activities to include independently caring for his personal hygiene, driving and running errands, walking, sitting

14

outdoors, going to the post office, watching television, and managing his own finances. (Id.) He further reported that he visited with friends and family, attended family gatherings, enjoyed spending time with his granddaughter, and had a fair relationship with his girlfriend's family. (Tr. at 18, 233-34.) Ms. Bell opined that his ability to maintain social functioning, persistence, and pace was within normal limits, though his prognosis was poor. (Tr. at 18, 234.)

On February 23, 2004, state agency medical consultant, Rosemary L. Smith, Psy.D., completed a form Psychiatric Review Technique, on which she opined that Claimant did not have a severe mental impairment, despite Claimant's depressive disorder, personality disorder, and his IQ scores. (Tr. at 243-56.) Dr. Smith accorded no weight to Claimant's IQ scores of May 8, 2003, because he had a CDL, was a truck driver, and was in the service. (Tr. at 255.) She acknowledged Claimant's difficulties concentrating and paying attention and that he tired easily and gave up easily on difficult tasks. (Id.) Dr. Smith questioned Claimant's credibility when she noted inconsistencies in his reports of polysubstance use or abuse. (Tr. at 255-56.) She opined that his mental impairments resulted in only mild limitations of activities of daily living, social functioning, concentration, persistence, and pace, and that he had no episodes of decompensation. (Tr. at 253.)

Claimant initiated treatment with Dr. M. K. Hasan, M.D., on February 23, 2004, for complains of depression and anxiety after his girlfriend's father shot himself in his presence. (Tr. at 18, 350-51.) Claimant reported nightmares, nervousness, depression, irritability, and an inability to tolerate crowds. (Id.) He reported that he left school in the twelfth grade, which was contrary to the earlier statements made to Ms. Waggoner and Ms. Walker, and to Ms. Bell. (Id.) He also reported a history of drug abuse. (Id.) On mental status examination, Dr. Hasan observed that Claimant was cooperative, talked clearly and audibly, and spoke rationally, though his speech lacked

15

spontaneity. (Id.) Dr. Hasan noted that Claimant's affect was dysphoric, that he was fully oriented, that he appeared to be of limited intelligence, and that his insight, judgment, and problem solving ability was poor. (Tr. at 18, 350-51.) There was no evidence of psychosis or thought disturbances, bizarre thought processes, active suicidal or homicidal ideation, or auditory and visual hallucinations. (Id.) Dr. Hasan noted that Claimant had a pre-morbid personality because he stayed to himself, had no particular hobbies, belonged to no club or organization, but had a girlfriend, and was able to care for his personal needs and chores, though with pain. (Tr. at 18, 350.) Dr. Hasan diagnosed major depression, recurrent, moderate-to-moderate severe in nature; a history of substance abuse, mixed type; and assigned him a global assessment of functioning of 50 to 55.[6] (Id.) He prescribed antidepressant medication and recommended church, calisthenics, and keeping in touch with his primary care physician. (Id.)

Claimant returned to Dr. Hasan on March 8, 2004, at which time he stated that he "continues to do fair." (Tr. at 18, 349.) Claimant reported that though medication helped, he could not sleep, and Dr. Hasan noted that he continued to exhibit a lot of social anxiety, fear, and panic. (Id.) Dr. Hasan increased Claimant's Paxil and recommended a biopsychosocial approach and counseling. (Id.) At a follow-up visit on April 5, 2004, Dr. Hasan noted that Claimant "continue[d] to do fair," though he had some difficulty sleeping. (Id.) Dr. Hasan continued Claimant's medications and again recommended that he attend church and perform calisthenics. (Id.)

---

[6]   The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994). A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. Id.

16

Crystal Whittington, M.A., a licensed psychologist, conducted a consultative evaluation of Claimant on November 4, 2005. (Tr. at 19, 352-64.) Claimant reported that he drove himself an hour and ten minutes to attend the examination. (Tr. at 19, 352.) Claimant reported a history of depression that worsened when he lost his job and when his ex-wife's father committed suicide. (Tr. at 19, 353.) Contrary to his previous statements that he witnessed his girlfriend's father's suicide, he told Ms. Whittington that he was in the building but in another room when the suicide occurred. (Id.) Claimant indicated that he had nightmares, was easily irritated, had feelings of helplessness and hopelessness, felt worthless and useless, lacked confidence and had poor self-esteem, that his mind wandered and that he had difficulty maintaining concentration for extended periods, and that his appetite was good. (Id.) Claimant denied suicidal thoughts. (Id.)

Ms. Whittington reviewed Claimant's school records that indicated he quit school in the tenth grade. (Id.) She also noted that intelligence testing while Claimant was in school indicated IQ scores of 88, 78, and 71. (Id.) Consistent with his report to Ms. Bell, Claimant reported to Ms. Whittington that he attended regular classes and was in special education classes as he indicated to Ms. Waggoner and Ms. Walker. (Tr. at 19, 355.) Ms. Whittington further reviewed the evaluation of Ms. Waggoner and Ms. Walker, the mental status exam of Ms. Bell, and the treatment notes from Dr. Hasan. (Tr. at 19, 354.) Claimant reported that he went to Dr. Hasan a few times after his friend committed suicide but stopped going because he "did not want to go anymore." (Id.) However, he indicated that his primary care physician, Dr. Whelan continued to prescribe psychotropic medications, which helped him. (Id.) Claimant reported a significant history of alcohol and drug use or abuse. (Tr. at 19, 355.)

Intelligence testing by Ms. Whittington revealed a verbal IQ of 67, a performance IQ of 67,

and a full scale IQ of 64. (Tr. at 19, 356.) Ms. Whittington opined that these IQ scores were consistent with those obtained by Ms. Waggoner and Ms. Walker. (Tr. at 19, 357.) She noted that his IQ scores dropped during his school years, which she attributed to his lack of motivation or emotional causes rather than to organ dysfunction or malingering. (Id.) She suspected that Claimant's "actual abilities fall within the lower average range but emotional disturbance (depression) interferes with test performance." (Id.) Ms. Whittington also noted that Claimant had some age-related visual problems and that he needed reading glasses. (Id.) Achievement testing on the WRAT-3 demonstrated that Claimant read at the seventh grade level and performed spelling and arithmetic at a third grade level. (Id.) Ms. Whittington opined that these scores were valid and consistent with those scores obtained by Ms. Waggoner and Ms. Walker. (Id.) Personality testing on the MMPI-2 revealed the "possibility of faking bad, [or] all true responding" on two scales. (Tr. at 19, 358.)

Claimant reported that he watched television, independently cared for his personal needs, occasionally ran the vacuum cleaner and cooked, walked through his yard, occasionally walked to a service station two hundred feet from his house, and seldom attended family gatherings. (Tr. at 19, 359.) On mental status exam, Ms. Whittington noted that Claimant was pleasant and cooperative, had normal tone and tempo of speech, and was not oriented for the month of the year. (Id.) Claimant's mood was depressed, his affect was mildly restricted, his thought process was logical and rational, his thought content was somewhat preoccupied, his insight was limited, and his judgment was moderately deficient. (Id.) Ms. Whittington noted that Claimant presented no evidence of hallucinations and denied suicidal or homicidal ideation. (Id.) His immediate memory was normal, remote memory, concentration, and pace were mildly deficient, and his persistence was

18

normal. (Tr. at 19, 359-60.) Ms. Whittington noted that during the exam, Claimant maintained eye contact, spoke readily and sometimes spontaneously, thanked her at the end of the exam and shook her hand, and interacted appropriately with other office staff. (Tr. at 19, 360.)

Ms. Whittington diagnosed major depressive disorder, chronic, moderate; polysubstance abuse dependence, in remission by history; mathematics disorder; and disorder of written expression.  (Tr. at 19, 360.) She explained that a diagnosis of mild mental retardation was not appropriate despite Claimant's IQ scores in the sixties because he set forth good effort and cooperation, he had performed at higher levels in the past, he was not in special education classes when in school, and he was not identified as mentally retarded prior to the age of twenty-three. (Tr. at 19, 361.)

Ms. Whittington also completed on November 4, 2005, a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 19, 362-64, 365-67.) Ms. Whittington opined that Claimant's ability to understand, remember, and carry out instructions was not affected by his impairment. (Tr. at 19, 362, 365.) She noted that Claimant "was able to understand and follow instructions on psychological tests." (Tr. at 19, 363, 366.) She further opined that Claimant's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were not affected by his impairment. (Tr. at 19, 363, 366.) Ms. Whittington explained that Claimant's "depression now appears primarily related to his physical problems, but personality testing indicates a tendency toward stress-related somatic symptoms." (Tr. at 19, 363-64, 366-67.)

Claimant's school records indicate IQ scores of 88, 78, 71, and 66 in preschool, first grade, third grade, and sixth grade respectively. (Tr. at 111.)

The ALJ determined that Claimant's depressive disorder and learning disorder of math and

written expression, though established by the medical evidence, were non-severe impairments because they did not result in more than mild restrictions in activities of daily living or abilities to maintain social functioning, concentration, persistence, or pace, and never resulted in episodes of deterioration or decompensation at work or in work-like settings. (Tr. at 19.) The ALJ further found as follows:

> Despite a well-documented history of polysubstance abuse, claimant has been inconsistent in statements made to various practitioners concerning a history of drug abuse, stating to at least one practitioner that he had never used any drugs (See Exhibit B-23). Additional inconsistent statements concerning whether or not special education classes were attended and how his driver's license was obtained have also been made. At best, claimant could be considered evasive. Although claimant testified at the hearing, and has recounted during psychological and physical consultative evaluations since 2002, that he has been capable of doing little more than lying around the house and watching television, treatment notes dated June 9, 2004, with Family Healthcare Associates, Inc., indicate that claimant was seen when he injured himself while "working on a porch" after kicking a two-by-four out of his way (Exhibit B-18F/1). Such a scenario hardly fits with the image claimant has consistently tried to portray of a man in such excruciating pain that he has been forced to "self-medicate" with street drugs.

(Tr. at 21-22.)

From a psychological standpoint, the ALJ further determined that there was no evidence that would preclude all work activity "since mental functioning is generally within normal limits despite some symptoms of depression and a history of alcohol and drug abuse." (Tr. at 22.) Despite Ms. Waggoner's and Ms. Walker's diagnosis of mild mental retardation, the ALJ noted that there was no evidence of deficits in adaptive functioning prior to the age of twenty-two. (Id.) The ALJ further noted that the record demonstrated that Claimant had a significant work history, which is counter indicative of significant deficits in adaptive behavior. (Id.) The ALJ accorded greater weight to the opinion of Ms. Whittington that despite Claimant's low IQ scores and poor math and reading skills, Claimant "was not truly functioning in the mentally retarded range." (Id.)

20

Based on the foregoing, the Court finds that the ALJ's decision that Claimant was not mildly mentally retarded is supported by substantial evidence. Though the evidence demonstrates requisite IQ scores of 60 through 70, Ms. Whittington opined that Claimant's actual abilities fell with in the lower average range but that depression interfered with his testing performance. Claimant argues that the ALJ improperly relied on this speculation of Ms. Whittington when both Ms. Whittington's and Ms. Waggoner's and Ms. Walker's IQ scores met the requisite level. In view of Claimant's reports of continued depression, the Court finds that the ALJ's reliance on Ms. Whittington's opinion was reasonable. Notwithstanding Claimant's IQ scores, as the ALJ determined, Claimant has not demonstrated deficits in adaptive functioning prior to the age of twenty-two.[7] (Tr. at 22.) The substantial evidence of record demonstrates that Claimant was not enrolled in special education classes in school, was able to drive, sustained a lengthy employment history of driving, was able to read and write, and managed his own finances. The Court finds support in the ALJ's decision that Claimant's adaptive functioning was not impaired prior to the age of twenty-two. The ALJ's decision that Claimant did not meet or equal a Listing for mental retardation is supported by substantial evidence. Consequently, the Court finds that the ALJ's according greater weight to the opinion of Ms. Whittington is supported by substantial evidence. As discussed above, the Court further finds that the ALJ properly considered Claimant's mental impairments.

---

[7] Claimant's educational records contain the following IQ scores: IQ of 88 in preschool in October, 1960; IQ of 78 in first grade in October, 1961; IQ of 71 in third grade in September, 1963; and IQ of 66 in sixth grade in October, 1966. (Tr. at 111.) Claimant's IQ score while in the sixth grade alone, suggests that Claimant may suffer from mental retardation. Nevertheless, as the ALJ found, the record does not contain and Claimant has not produced any evidence of adaptive deficits. Accordingly, the IQ scores contained in Claimant's educational records are of no moment to the ALJ's analysis.

2. <u>Vocational Expert Testimony</u>.

Claimant further alleges that the ALJ erred in presenting hypothetical questions to the vocational expert which did not include any limitations regarding Claimant's psychological and psychiatric impairment, and his learning disability. (Document No. 15 at 7.) The Commissioner asserts that the ALJ extensively questioned the VE regarding the mental demands of the jobs identified, and therefore, Claimant's argument is without merit. (Document No. 19 at 17.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. <u>See</u> <u>Benenate v. Schweiker</u>, 719 F.2d 291, 292 (8th Cir. 1983).

In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 405-13.) The ALJ first asked whether a person of Claimant's age, education, and past relevant work experience, who was limited to occasionally lifting or carrying twenty pounds and frequently lifting or carrying ten pounds; standing, walking, or sitting with normal breaks for six hours in an eight-hour workday; and frequently climbing, balancing,

stooping, kneeling, crouching, and crawling, could perform any work. (Tr. at 405.) In response to the ALJ's hypothetical, the VE responded that such person could perform unskilled light jobs such as a vehicle equipment cleaner, parking lot attendant, janitor/cleaner, and domestic cleaner, but could not perform Claimant's past relevant work. (Tr. at 405-06.) The ALJ then asked whether any of the jobs identified would be altered with the inclusion of occasional postural limitations. (Tr. at 406.) The VE responded that such limitations would allow an individual to perform the jobs identified above. (Id.)

The ALJ further asked whether any of the jobs identified would be altered with the inclusion of a limitation that the individual avoid concentrated exposure to extreme cold and vibration. (Tr. at 407.) The VE responded that such limitations would exclude the vehicle equipment cleaner job, but the VE replaced it with the job of a kitchen worker. (Id.) The ALJ then asked whether such an individual would need good math abilities to perform the jobs identified. (Id.) The VE responded that Claimant's past relevant work was rated at a level one, and that with the exception of the parking lot attendant, none of the jobs identified required a math, language, or reasoning level greater than level one. (Tr. at 407-08.) The VE thus excluded the parking lot attendant, and explained that none of the other jobs, janitor, domestic cleaner, or kitchen worker, required the ability for good written expression, writing ability, or to understand, remember, or carry out detailed or complex instructions. (Tr. at 408.) The VE testified that the identified jobs required only short, easy to learn job tasks consistent with unskilled work, and that the janitor job required only minimal interaction with the public, but did not require the individual to perform services to the general public. The ALJ also asked whether any of the jobs identified would be excluded if the individual had to lie down during the day on unscheduled breaks. (Tr. at 409.) The VE responded that such

limitations would result in the individual's discharge from any job. (Id.) The ALJ then excluded the kitchen worker job due to Claimant's diagnosed hepatitis C. (Tr. at 411-12.) Finally, the ALJ asked the VE whether an individual limited to performing light work, limited to occasional postural limitations; simple, easy, unskilled work with a math, language, and reasoning level of one; and no concentrated exposure to extreme cold or vibrations, could perform any work. (Tr. at 412.) The VE responded that in addition to the janitor and domestic cleaner jobs, such an individual could perform the job of a laundry worker. (Id.)

Based on the foregoing, the Court finds that the ALJ presented a hypothetical question to the VE that contained Claimant's physical and mental limitations supported by the record. Claimant generally asserts that the ALJ's hypothetical questions ignore Claimant's "psychological and psychiatric impairment as well as his learning disability." (Document No. 15 at 7.) Contrary to Claimant's allegations, the ALJ's hypothetical questions clearly contemplated Claimant's mathematic and written expression disorders. Though the ALJ ultimately found that Claimant could perform the job of a parking lot attendant, which had a math level of two, the ALJ also found that Claimant could perform the jobs of a janitor and domestic worker, which had math levels of one. The ALJ further presented hypothetical questions that contained Claimant's ability to perform only simple, unskilled work and limitations that he not work around the general public. Claimant does not identify any specific limitations which the ALJ failed to include in his hypothetical questions. Accordingly, the Court finds that the ALJ's hypothetical questions to the VE were proper and in accordance with the applicable law and Regulations. The ALJ's decision is supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the

Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment (Document No. 14.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 19.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 29, 2008.

R. Clarke VanDervort
United States Magistrate Judge